# Exhibit A

Electronically Filed
4/12/2021 9:37 AM
Steven D. Grierson
CLERK OF THE COURT

1  COMP
   MICHAEL D. HAIGHT, ESQ.
2  Nevada Bar No. 5654
   GENEVIEVE ROMAND, ESQ.
3  Nevada Bar No. 13235
   HENNESS & HAIGHT
4  8972 Spanish Ridge Avenue
   Las Vegas, Nevada 89148
5  (702) 862-8200 Telephone
   (702) 862-8204 Facsimile
6  genevieve@hennessandhaight.com
   *Attorneys for Plaintiff*
7
                                        **CASE NO: A-21-832741-C**
                                              **Department 4**

8                      **DISTRICT COURT**

9                 **CLARK COUNTY, NEVADA**

10                          * * *

11  RACHELLE CRUPI, individually, and as        CASE NO.
    Special Administrator, Personal Representative,
12  and heir to the Estate of ALETHA PORCARO,    DEPT. NO.
    deceased,

13              Plaintiff,

14      vs.                                      **COMPLAINT**

15  THE HEIGHTS OF SUMMERLIN, LLC, a
    foreign limited liability corporation; SUMMIT
16  CARE, LLC, a foreign limited liability
    corporation; GENESIS HEALTHCARE, INC., a
17  domestic corporation, LATOYA DAVIS,
    individually and as Administrator; ANDREW
18  REESE, individually and as Administrator; DOE
    EMPLOYEES I through X; DOE SERVICE
19  PROVIDERS I through X, DOE GOVERNING
    MEMBERS I through X; ROE GOVERNING
20  BODIES I through X; and DOES XI through
    XX; and ROE CORPORATIONS XI through
21  XX, inclusive,

22

23              Defendants.

24

25      By and through undersigned counsel, Plaintiff brings this action and alleges as follows:

26                          **PARTIES**

27      1.      Aletha Porcaro ("Ms. Porcaro"), deceased, was, during the pertinent times, a

28  resident of The Heights of Summerlin ("The Heights Facility"), located at 10550 W. Park Run Dr.,

                          Page 1 of 37

Las Vegas, Nevada 89144. She was born on February 11, 1938, Ms. Porcaro had been a long-time resident of Clark County, Nevada where her daughter, and the Plaintiff to this action, Rachelle Crupi ("Plaintiff") lived.

2.      Defendant, The Heights of Summerlin, LLC is a foreign limited liability company, a subsidiary of Genesis Healthcare, Inc., which owned, operated, controlled, inspected, managed, and/or supervised The Heights Facility, a facility for skilled nursing, and at the times relevant was responsible for the supervision, care, and custody of the residents at The Heights Facility, including Ms. Porcaro.

3.      Defendant, Summit Care, LLC is a foreign limited liability company, a subsidiary of Genesis Healthcare, Inc., which owned, operated, controlled, inspected, managed, and/or supervised The Heights Facility, a facility for skilled nursing, and at the times relevant was responsible for the supervision, care, and custody of the residents at The Heights Facility, including Ms. Porcaro.

4.      Defendant, Genesis Healthcare, Inc. is a domestic corporation and the parent company to The Heights of Summerlin, LLC and/or Summit Care, LLC which leased, owned, operated, controlled, inspected, managed, and/or supervised The Heights Facility, a facility for skilled nursing, and at the times relevant was responsible for the supervision, care, and custody of the residents at The Heights Facility, including Ms. Porcaro.

5.      Defendant, Latoya Davis is an individual and an Administrator of The Heights Facility, a facility for skilled nursing, and at the times relevant was responsible for the supervision, care, and custody of the residents at The Heights Facility, including Ms. Porcaro.

6.      Defendant, Andrew Reese is an individual and an Administrator of The Heights Facility, a facility for skilled nursing, and at the times relevant was responsible for the supervision, care, and custody of the residents at The Heights Facility, including Ms. Porcaro.

7.      Pursuant to NRCP 10(a) and *Nurenberger Hercules-Werke GMBH v. Virostek*, 107 Nev. 873, 822 P.2d 1100 (1991), the true names and capacities, whether individual, corporate, associate or otherwise of Defendants named herein as DOE EMPLOYEES I through X; DOE SERVICE PROVIDERS I through X, ROE SERVICE PROVIDERS I through X; DOE

1  GOVERNING MEMBERS I through X; ROE GOVERNING BODIES I through X; and DOES

2  XI through XX; and ROE CORPORATIONS XI through XX, inclusive are unknown to Plaintiff,

3  who, therefore, sues Defendants by said fictitious names. Upon information and belief, these DOE

4  and ROE Defendants, and each of them, are responsible in some manner for the events and

5  happenings upon which this action is premised, or of similar actions directed against Ms. Porcaro

6  and/or the Plaintiff about which Plaintiff is presently unaware, and which directly and proximately

7  caused injury and damages as herein alleged. DOE and ROE Defendants include, but are not

8  limited to, caregivers, contractors, subcontractors, suppliers and vendors. Plaintiff will ask leave

9  of this Court to amend the Complaint to insert the true names and capacities of DOE and ROE

10  Defendants when the same have been ascertained and to join such Defendants in this action

11       8.    Defendants own, operate and control, are employed at, or otherwise have

12  materially, jointly, and severally participated in the events giving rise to liability as set forth herein

13  with respect to The Heights Facility, credential number 4146-SNF-26.

14       9.    The Nevada Department of Health and Human Services, Nevada Division of Public

15  and Behavioral Health licensed the Heights Facility as a facility for skilled nursing. On information

16  and belief, The Heights Facility license was first issued on December 23, 2004, the facility has a

17  total of 190 beds available, and the facility accepts Medicare and Medicaid.

18       10.    Genesis Healthcare, Inc. is a publicly traded parent corporation that, along with its

19  subsidiaries such as Summit Care, LLC and The Heights of Summerlin, LLC, comprises one of

20  the nation's largest post-acute care providers with hundreds of healthcare facilities nationwide.

21                             **JURISDICTION AND VENUE**

22       11.    Ms. Porcaro's injury and harm, and Plaintiff's resulting injury and harm, occurred

23  at The Heights Facility. Diversity jurisdiction does not apply in this matter.

24       12.    This Court has personal jurisdiction over the Defendants based on minimum

25  contacts with the forum.

26       13.    This Court has jurisdiction over the parties and the subject matter as the amount in

27  controversy exceeds $15,000.

28

14.     The Plaintiff and Ms. Porcaro are/were both citizens of the State of Nevada, County of Clark.

15.     Defendant, The Heights of Summerlin, LLC is a foreign limited liability company authorized and actually doing business in the State of Nevada, County of Clark.

16.     Defendant, Summit Care, LLCs a foreign limited liability company authorized and actually doing business in the State of Nevada, County of Clark.

17.     Defendant, Genesis Healthcare, Inc. is a domestic corporation authorized and actually doing business in the State of Nevada, County of Clark.

18.     Defendant, Latoya Davis, is known to be a citizen of the State of Nevada, credentialed, authorized, and actually performing business in the State of Nevada, County of Clark.

19.     Defendant Andrew Reese, is known to be a citizen of the State of Nevada, credentialed, authorized, and actually performing business in the State of Nevada, County of Clark.

20.     Plaintiff's claims do not fall under the exclusive jurisdiction of the federal courts.

21.     While a party may bring a claim in federal court if it arises under federal law, federal question jurisdiction requires (1) that the federal element appears on the face of a well-pled complaint; (2) that the federal element is a substantial component of the complainant's claim; and (3) that the federal element is of significant federal interest.

22.     In the instant case the federal element, namely the violations of 42 C.F.R. 483 *et seq.*, while serious, are not a substantial component of the overall claim.

23.     The United States Supreme Court has found that a "suit arises under the law that creates the cause of action," and therefore, only suits based on federal law, not state law suits, are most likely to create federal question jurisdiction. *American Well Works v. Layne*, 241 U.S. 257 (1916); *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149 (1908).

24.     In the instant case the claims are based, primarily, on state law, not federal law, thus no federal question jurisdiction is created.  Specifically the claims alleged herein are based in negligence and tort.

25.     Plaintiff in this case relies, only in part, on violations of federal statutes in pleading negligence *per se*, which the U.S. Supreme Court has held is insufficient to find federal question

1 jurisdiction over state law claims. *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804

2 (1988).

3      26.    Jurisdiction is proper in this Court.

4      27.    Venue is proper in this Court.

5                                   **FACTUAL ALLEGATIONS**

6      28.    The Heights Facility touts itself as a "offering excellent care in an environment that

7 is dedicated to a speedy recovery and returning home as quickly as possible."[1]

8      29.    In fact, nothing could have been further from the truth at The Heights Facility. The

9 facility was poorly staffed and supported by its corporate owners and by April 14, 2020 had

10 received an agency inspection reflecting unsafe and unsanitary conditions. Yet the Defendants

11 failed to correct matters and created a lethal cesspool in which SARS COVID-19 was allowed to

12 fester and spread despite the generally accepted scientific understanding that SARS COVID-19 is

13 especially deadly for elderly individuals, who may have chronic health conditions, a weakened

14 immune system, and who may reside in a facility like The Heights Facility.

15      30.    SARS COVID-19 is a "communicable disease" subject to infectious disease

16 reporting and regulation in accordance with NRS 441A.120, and NAC 441A.040(58).

17      31.    The Centers for Disease Control and Prevention (CDC) has recommended Personal

18 Protective Equipment (PPE) and donning procedures for COVID-19 including disposable gowns,

19 disposable gloves, N95 Respirator or surgical masks, a disposable face shield or goggles.

20      32.    As a self-proclaimed sophisticated elder care facility employing specially trained

21 professionals and enjoying vast financial resources at their disposal, the Defendants had a duty to

22 conduct immediate, extensive due diligence and take any and all steps necessary to avoid the

23 spread of SARS COVID-19 in The Heights Facility. However, Defendants failed to satisfy their

24 duties, resulting in the injuries and death of Ms. Porcaro and impacting the community as alleged

25 herein.

26

27

28 [1] https://www.theheightsofsummerlin.com/services.

33.     Ms. Porcaro, while elderly, was a radiant and lively individual when she entered The Heights Facility on February 15, 2020 for post-acute rehabilitation following surgery to repair a fractured femur. Neither Ms. Porcaro, nor her daughter, could imagine the danger awaiting her at The Heights Facility as they were both assured that no one living or working in the facility had SARS COVID-19 and that she would be afforded quality care to avoid exposure to the deadly virus.

34.     Because the Defendants failed to take prompt and preemptive action as the SARS COVID-19 virus began to spread around the world, Ms. Porcaro became a victim of the virus and of Defendants' improper, inadequate, and reckless conduct. Ms. Porcaro contracted SARS COVID-19 at The Heights Facility, fell seriously ill, and died a painful death on April 21, 2020, just 66 days after she was admitted to The Heights Facility.

35.     This complaint is filed for the serious injury and suffering that Ms. Porcaro, her family, and others similarly situated have endured and continue to suffer due to the negligent, reckless, and culpable conduct for which the Defendants are jointly and severally responsible.

**Conditions at The Heights Facility**

36.     An agency survey of The Heights Facility was conducted on January 23, 2020 as reported by State health authorities through the Department of Health and Human Services, Centers for Medicare & Medicaid Services.[2]

37.     This January 23, 2020 Statement of Deficiencies was generated as a result of an investigation of Facility Reported Incidents and a complaint at The Heights Facility on January 23, 2020, in accordance with 42 C.F.R. § 483 – Requirements for Long Term Care Facilities. The following regulatory deficiencies were identified: § 483.12(c)(1) and (4) – Reporting of Alleged Violations; § 483.21(b)(1) – Develop/Implement Comprehensive Care Plan; § 483.25(d)(1-2) – Free of Accident Hazards/Supervision/Devices.

38.     The Heights Facility failed to ensure that investigation reports of abuse and neglect were timely and accurately submitted to state agencies. The Heights Facility failed to ensure that

---

[2] http://dpbh.nv.gov/Reg/HealthFacilities/dta/Media/Find_a_Health_Facility/

care plans for residents were consistently followed. The Heights Facility failed to complete risk assessments for its residents. As a result of these failures, resident health and safety was jeopardized.

39. An agency survey of The Heights Facility was conducted from April 14, 2020 through May 8, 2020 as reported by State health authorities through the Department of Health and Human Services, Centers for Medicare & Medicaid Services.[3]

40. This May 8, 2020 Statement of Deficiencies was generated as a result of an investigation of a Centers for Medicare and Medicaid Services COVID-19 Focused Infection Control survey conducted at The Heights Facility from April 14, 2020 through May 8, 2020, in accordance with 42 C.F.R. § 483 – Requirements for Long Term Care Facilities. The following regulatory deficiencies were identified: § 483.80(a)(1), (2), (4), and (e – f) – Infection Prevention & Control.

41. The Heights Facility failed to ensure proper infection control practices were followed during the response to a COVID-19 infection outbreak. The Heights Facility failed to ensure medical screenings and clinical competency validations for the N95 respirator/mask were completed. The Heights Facility failed to ensure policies for the use and disposition of personal protective equipment (PPE) was followed. The Heights Facility failed to ensure visitors were screened for signs and symptoms of COVID-19 at designated checkpoints. The Heights Facility failed to post signage to identify isolation rooms. The Heights Facility failed to ensure guidelines for cleaning and storage of PPE were followed.

42. An agency survey of The Heights Facility was initiated on April 14, 2020 and finalized on May 8, 2020 as reported by State health authorities through the Division of Public and Behavioral Health.[4]

/ / /

/ / /

---

[3] Id.

[4] Id.

43.     This May 8, 2020 Statement of Deficiencies was generated as the result of the State licensure survey COVID-19 Focused Infection Control survey initiated at The Heights Facility on April 14, 2020, and finalized on May 8, 2020, in accordance with the NAC § 449 – Skilled Nursing Facilities. The following regulatory deficiencies were identified: § 449.74415 – Responsibilities of Governing Body; § 441A.230 – 240 – Duty to Report; § 449.74473 – Program for Control of Infections.

44.     The Heights Facility failed to ensure that its governing body, which is legally responsible for establishing and carrying out policies regarding the management and operation of the facility, adequately performed its duties. The Heights Facility failed to report the Infection Preventions or designee reported data related to COVID-19 cases for both residents and staff and COVID related deaths to the Office of Public Health Informatics and Epidemiology (OPHIE). The Heights Facility failed to ensure that reporting of COVID-19 cases for both residents and staff, and COVID related deaths were timely, accurately, consistently, and without omissions entered into the Research Electronic Data Capture System (REDCAP). The Heights Facility failed to provide completed forms to government agencies for persons under investigation in an accurate and timely manner. The Heights Facility failed to ensure proper infection control practices were followed during the response to a COVID-19 infection outbreak. The Heights Facility failed to ensure medical screenings and clinical competency validations for the N95 respirator/mask were completed. The Heights Facility failed to ensure policies for the use and disposition of PPE was followed. The Heights Facility failed to ensure visitors were screened for signs and symptoms of COVID-19 at the designated checkpoints. The Heights Facility failed to post signage to identify isolation rooms. The Heights Facility failed to ensure guidelines for cleaning and storage of PPE were followed.

45.     An agency survey of The Heights Facility was conducted on June 18, 2020 as reported by State health authorities through the Department of Health and Human Services, Center for Medicare & Medicaid Services.[5]

_____
[5] Id.

46.    This June 19, 2020 Statement of Deficiencies was generated as a result of an investigation of a Centers for Medicare and Medicaid Services COVID-19 Focused Infection Control survey initiated at The Heights Facility on June 18, 2020 and finalized on June 19, 2020, in accordance with 42 C.F.R. § 483 – Requirements for Long Term Care Facilities.

47.    An agency survey of The Heights Facility was initiated on June 18, 2020 and finalized on June 19, 2020 as reported by State health authorities through the Bureau of Health Care Quality and Compliance.[6]

48.    This June 19, 2020 Statement of Deficiencies was generated as the result of the State Licensure Complaint Investigation initiated at The Heights Facility on June 18, 2020 and finalized on June 19, 2020, in accordance with the NAC § 449 – Skilled Nursing Facilities. The following regulatory deficiencies were identified: § 449.74415 – Responsibilities of Governing Body; § 449.74493 – Notification of Changes or Condition;

49.    The Heights Facility failed to ensure that its governing body, which is legally responsible for establishing and carrying out policies regarding the management and operation of the facility, adequately performed its duties. The Heights Facility failed to ensure resident family members were contacted in a timely manner. The Heights Facility failed to notify the physician of significant changes in a resident's condition and symptomology.

50.    An agency survey of The Heights Facility was conducted on July 2, 2020 as reported by State health authorities through the Department of Health and Human Services, Centers for Medicare & Medicaid Services.[7]

51.    This July 2, 2020 Statement of Deficiencies was generated as a result of an investigation of a Centers for Medicare and Medicaid Services Focused Infection Control survey conducted at The Heights Facility on July 2, 2020, in accordance with 42 C.F.R. § 483 – Requirements for Long Term Care Facilities.

///

---

[6] Id.

[7] Id.

52.     An agency survey of The Heights Facility was conducted on July 30, 2020 as reported by State health authorities through the Division of Public and Behavioral Health.[8]

53.     This July 30, 2020 Statement of Deficiencies was generated as a result of a survey by the Division of Public and Behavioral Health, in accordance with the NAC § 449 – Skilled Nursing Facilities. The following regulatory deficiencies were identified: § 449.74415 – Responsibilities of Governing Body; § 441A.230 – 240 – Duty to Report; § 449.74473 – Program for Control of Infections.

54.     The Heights Facility failed to ensure that its governing body, which is legally responsible for establishing and carrying out policies regarding the management and operation of the facility, adequately performed its duties. The Heights Facility failed to timely, accurately, consistently, and without omissions report and input data related to a suspected COVID-19 staff member. The Height Facility failed to ensure the Infection Preventionist or designee reported the suspected staff COVID-19 case to OPHIE in a timely manner or input the data regarding the suspected infection into REDCAP in a timely manner. The Heights Facility failed to establish and maintain a program for the control of infections within the facility.

55.     An agency survey of The Heights Facility was conducted on October 1, 2020 as reported by State health authorities through the Department of Health and Human Services, Centers for Medicare & Medicaid Services.[9]

56.     This October 1, 2020 Statement of Deficiencies was generated as a result of an investigation of a Centers for Medicare and Medicaid Services Focused Infection Control survey conducted at The Heights Facility on October 1, 2020, in accordance with 42 C.F.R. § 483 – Requirements for Long Term Care Facilities.

///

///

///

---

[8] Id.

[9] Id.

57.     Under 42 C.F.R § 483.12(c)(1) The Heights Facility was charged with ensuring that all alleged violations involving abuse, neglect, exploitation, or mistreatment of residents were reported in a timely manner and it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

58.     Under 42 C.F.R. § 483.12(c)(4) The Heights Facility was charged with ensuring that results of all investigations involving abuse, neglect, exploitation, or mistreatment of residents were reported to the administrator and/or the designated representative as well as the appropriate officials and it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

59.     Under 42 C.F.R. § 483.21(b)(1) The Heights Facility was charged with developing and implementing a comprehensive person-centered care plan for each resident and it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

60.     Under 42 C.F.R. § 483.25(d)(1) The Heights Facility was charged with ensuring the resident environment remained as free of accident hazards as possible and it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

61.     Under 42 C.F.R. § 483.25(d)(2) The Heights Facility was charged with ensuring each resident received adequate supervision and assistance and it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

62.     Under 42 C.F.R. § 483.80(a)(1) The Heights Facility was charged with establishing an infection prevention and control program that included a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, and others at the facility in accordance with regulations and "following accepted national standards" but it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

///

63.     Under 42 C.F.R. § 483.80(a)(2) The Heights Facility was charged with establishing an infection prevention and control program that included conforming written standards, policies, and procedures but it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

64.     Under 42 C.F.R. § 483.80(a)(4) The Heights Facility was charged with establishing an infection prevention and control program that included a system for recording incidents identified and the corrective actions taken by the facility but it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

65.     Under 42 C.F.R. § 483.80(e) The Heights Facility was charged with establishing and maintaining an infection prevention and control program which was designed to provide a safe, sanitary, and comfortable environment conducive to preventing the development and transmission of communicable diseases and infections including handling, storage, processing, and transporting of linens in a manner so as to prevent the spread of infection but it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

66.     Under 42 C.F.R. § 483.80(f) The Heights Facility was charged with establishing and maintaining an infection prevention and control program which was designed to provide a safe, sanitary, and comfortable environment conducive to preventing the development and transmission of communicable diseases and infections including provisions for an annual review and periodic updating of the program but it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

67.     Under NAC 449.74415 The Heights Facility was charged with having a governing body legally responsible for carrying out policies regarding the management and operation of the facility but it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

///

68.     Under NAC 449.74473 The Heights Facility was charged with maintaining a conforming program for the control of infections within the facility but it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

69.     Under NAC 449.74493 The Heights Facility was charged with notifying a patient, their representative, interested family members, and the patient's physician when significant changes to the medical condition of the patient occur and keeping records of such notifications but it failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

70.     Under NAC 441A.230 health care providers have duty to report a case or suspected case of an infectious and/or communicable disease, including but not limited to SARS COVID-19, to the health authority with jurisdiction in the manner provided by statute but the Defendants failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

71.     Under NAC 441A.240 directors or other persons in charge of a medical facility have a duty to report a case or suspected case of an infectious and/or communicable disease, including but not limited to SARS COVID-19, to the health authority with jurisdiction in the manner provided by statute and to adopt administrative procedures for making such reports but the Defendants failed to do so. This failure caused and/or contributed to dozens of individuals, including Ms. Porcaro, becoming infected with COVID-19 and dying prematurely.

72.     Medical providers and other staff working at The Heights Facility, including those working in the designated quarantine areas of the facility, were not properly trained on the use of PPE, including donning and doffing. They were unclear on the proper use of PPE.

73.     Medical providers and other staff working at The Heights Facility, including those working in the designated quarantine areas of the facility, wore PPE that was not fit tested and for which they were not medically cleared to use.

74.     The Heights Facility failed to properly maintain staff medical clearances, completed health questionnaires, and fit test documentation related to the use of N95 respirators.

75.     Medical screenings and N95 Respirator Fit Tests at The Heights Facility were not performed every 12 months.

76.     Medical providers and staff at The Heights Facility who were not medically screened, fit tested, or educated on the wear, maintenance, and storage of N95 Respirators were assigned to work in the designated COVID-19 quarantine unit.

77.     Staff at The Heights Facility who were not medically screened, fit tested, or educated on the wear, maintenance, and storage of N95 Respirators were assigned to clean the respiratory isolation areas of the facility.

78.     As of May 8, 2020 The Heights Facility only had one staff member performing N95 Respirator Mask Fit Testing, a Nurse Educator who did not have the requisite knowledge to perform the testing and make determinations regarding medical clearances or disqualifying conditions.

79.     Medical providers and other staff working at The Heights Facility, including those working in the designated quarantine areas of the facility, failed to wear PPE. Others failed to wear adequate PPE. And, they failed to properly and safely wear PPE to ensure protection of themselves and others from contracting the deadly COVID-19 virus.

80.     Medical providers and other staff working at The Heights Facility, including those working in the designated quarantine areas of the facility, failed to properly dispose of and disinfect used PPE, even after working in designated quarantine areas of the facility. They traversed the facility and interacted with other staff members and residents in contaminated PPE.

81.     Medical providers and other staff working at The Height Facility, including those who tested positive for COVID-19 and those who were symptomatic for or suspected of having COVID-19, were permitted to traverse the facility buildings without donning PPE.

82.     Medical providers and other staff working at The Heights Facility, including those working in the designated quarantine areas of the facility, failed to properly store PPE between uses and failed to properly clean and disinfect PPE between uses.

83.     Residents of The Heights Facility were permitted to engage in group activities without donning PPE.

84. Residents of The Heights, including those who tested positive for COVID-19 and those who were symptomatic for or suspected of having COVID-19, were permitted to traverse the facility buildings without donning PPE.

85. The Heights Facility failed to maintain a sufficient and accessible supply of adequate PPE at the facility to reduce the transmission of infectious diseases, including COVID-19.

86. The Heights Facility failed to install appropriate signage regarding donning and doffing PPE in the designated quarantine areas of the facility and in resident rooms designated as isolation rooms.

87. Residents of The Heights Facility, including newly admitted, re-admitted, and transferred residents, were not properly or effectively screened for infectious diseases, including COVID-19.

88. Residents of The Heights Facility, including newly admitted, re-admitted, and transferred residents, were not properly or effectively tested for infectious diseases, including COVID-19.

89. Medical providers and other staff working at The Heights Facility were not properly or effectively screened for infectious diseases, including COVID-19.

90. Medical providers and other staff working at The Heights Facility were not properly or effectively tested for infectious diseases, including COVID-19.

91. Visitors and vendors at The Heights Facility were not properly or effectively screened for infectious diseases, including COVID-19.

92. The Heights Facility failed to properly monitor entrances and exits to the facility to ensure that vendors and other visitors entering the facility were screened for COVID-19 related symptoms and donned required PPE.

93. Residents of The Heights Facility, including those who were tested positive for COVID-19, were symptomatic for COVID-19, or otherwise suspected to be positive for COVID-19, were not properly or effectively quarantined to reduce the transmission of infectious diseases, including COVID-19.

94.     Newly admitted, re-admitted, and transferred residents of The Heights Facility, including those who were tested positive for COVID-19, were symptomatic for COVID-19, or otherwise suspected to be positive for COVID-19, were not properly or effectively quarantined to reduce the transmission of infectious diseases, including COVID-19.

95.     Medical providers and other staff working at The Heights Facility, including those who were tested positive for COVID-19, were symptomatic for COVID-19, or otherwise suspected to be positive for COVID-19, were not properly or effectively quarantined to reduce the transmission of infectious diseases, including COVID-19.

96.     Medical providers and other staff working at The Heights Facility, including those working in the designated quarantine areas of the facility, were unclear on the proper procedures for working in and around designated quarantine units to reduce the transmission of infectious diseases, including COVID-19.

97.     The Heights Facility failed to establish designated quarantine areas or units to reduce the transmission of infectious diseases, including COVID-19.

98.     The Heights Facility failed to establish designated staff teams to reduce the transmission of infectious diseases, including COVID-19.

99.     Social distancing among and between medical providers, staff, residents, vendors, and visitors was not practiced, encouraged, or enforced by The Heights Facility to reduce the transmission of infectious diseases, including COVID-19.

100.    Medical providers and staff at The Heights Facility failed to adhere to hygiene standards designed to reduce the transmission of infectious diseases, including COVID-19, such as handwashing before and after contact with residents and after performing work in the designated quarantine areas of the facility.

101.    The Heights Facility failed to display appropriate signage regarding social distancing and personal hygiene designed to reduce the transmission of infectious diseases, including COVID-19.

///

///

102. The Heights Facility failed to develop, implement, and enforce a social distancing policy/practice for use in elevators and other confined spaces to reduce the transmission of infectious diseases, including COVID-19.

103. Medical providers, staff, and vendors at The Heights Facility failed to properly clean and disinfect surfaces and equipment at facility to reduce the transmission of infectious diseases, including COVID-19.

104. Medical providers, staff, and vendors at The Heights Facility were permitted to traverse the facility, including quarantined areas of the facility, without properly disinfecting their equipment to reduce the transmission of infectious diseases, including COVID-19.

105. The Heights Facility failed to provide biohazard receptacles for use in disposing of used PPE to reduce the transmission of infectious diseases, including COVID-19.

106. The Heights Facility failed to timely, accurately, consistently, and without omission report COVID-19 deaths as well as COVID-19 positive cases and suspected cases among staff and residents to the applicable health authorities.

107. Medical providers and other staff working at The Heights Facility failed to timely, accurately, consistently, and without omission report known or suspected cases of communicable diseases, including COVID-19, to the Infection Preventionist and/or designee on staff at the facility or applicable health authorities.

108. The Heights Facility failed to develop and implement an administrative procedure for reporting known or suspected cases of communicable diseases, including COVID-19, which complied with the Nevada Revised Statutes and the Nevada Administrative Code.

109. Known or suspected cases of COVID-19 were not properly reported by The Heights Facility and were only discovered by third-party review of positive lab results in The National Electronic Disease Surveillance System Base System (NBS).

110. Medical providers and other staff working at The Heights Facility with positive COVID-19 test results were identified but never reported to the health authorities by The Heights Facility.

///

111.   Reports submitted by The Heights facility to the health authorities regarding COVID-19 related deaths, positive cases, and suspected cases contained inaccuracies and frequently had data elements that were left blank which made it impossible to match reported cases to lab results in the NBS.

112.   Reports submitted by The Heights Facility to the health authorities regarding COVID-19 related deaths, positive cases, and suspected cases were duplicates which hindered the ability of the applicable health authorities to correctly analyze and report infection data.

113.   The Heights Facility failed to report accurate numbers of COVID-19 related deaths on the forms submitted to the applicable health authorities.

114.   The Heights Facility's failure to timely update COVID-19 data caused deaths associated with the facility to be underreported.

115.   The Heights Facility failed to timely update COVID-19 data to identify ill and infected persons who recovered from COVID-19, and when they finally updated the data following a request from the applicable health authority, the facility's death count more than doubled from 8 to 18.

116.   The Heights Facility's failure to timely, accurately, consistently, and without omission report and enter data regarding COVID-19 positive cases and deaths forced the applicable health authority to audit the data reported by the facility, again increasing the death count associated with the facility from 18 to 24.

**The Untimely and Preventable Death of Aletha Porcaro**

117.   Ms. Porcaro moved in to The Heights Facility on February 15, 2020. Neither Ms. Porcaro, nor her loved ones, had any idea of the poor and dangerous conditions then existing in the facility.

118.   Visitors were permitted at The Heights Facility until March 12, 2020, despite significant community spread of COVID-19.

119.   On March 19, 2020 Ms. Porcaro and the Plaintiff were told by The Heights Facility that no patients or employees at the facility were infected with the COVID-19 virus.

///

1       120.   Temperature screenings of residents for COVID-19 did not begin at The Heights

2  Facility until April 5, 2020.

3       121.   On April 13, 2020 Ms. Porcaro was discharged from The Heights Facility and

4  transported to a senior-living apartment complex, The Wentworth.

5       122.   Upon information and belief, Ms. Porcaro was not tested or screened for COVID-

6  19 prior to discharge and the understanding of Plaintiff and Ms. Porcaro was that there was no

7  COVID-19 exposure at The Heights Facility.

8       123.   The Heights Facility failed to inform Ms. Porcaro, Plaintiff, or any

9  employees/agents/residents of The Wentworth that COVID-19 infections had been confirmed, and

10  or were presumed to have been confirmed, at The Heights Facility.

11       124.   As Plaintiff and other concerned family and friends would only later learn, as of

12  April 14, 2020 there were at least four positive COVID-19 residents at The Heights Facility and

13  at least six presumptive positive COVID-19 residents at The Heights Facility.

14       125.   As Plaintiff and other concerned family and friends would only later learn, as of

15  April 25, 2020 there were at least 41 known positive COVID-19 staff members at The Heights

16  Facility, at least known 22 positive COVID-19 residents at The Heights Facility; and, at least, three

17  presumptive positive COVID-19 residents at The Heights Facility.

18       126.   As Plaintiff and other concerned family and friends would only later learn, by May,

19  2020 there were up to 71 known positive COVID-19 residents at The Heights Facility, at least 50

20  known positive COVID-19 staff members at The Heights Facility, and, at least, 24 known positive

21  COVID-19 deaths associated with The Heights facility. These 24 deaths amounted for more than

22  one-quarter of all fatalities in state-run or state-licensed facilities at the time (26% of the 93 deaths

23  of resident of assisted living homes, prisons, and some day care facilities)[10].

24       127.   The same day Ms. Porcaro was transported from The Heights Facility to The

25  Wentworth she reported pain and discomfort.

26

27  —————————————

[10]  https://www.reviewjournal.com/local/summerlin/summerlin-nursing-home-reports-16-deaths-in-a-day-24-total-

28  2032473/

128.    The day after Ms. Porcaro arrived at The Wentworth, April 14, 2020, she was found to have a high fever and other symptoms indicative of the COVID-19 virus. She was transported to Summerlin Hospital where a COVID-19 test was administered.

129.    On April 16, 2020 Ms. Porcaro's COVID-19 test results confirmed that she was POSITIVE for the COVID-19 virus.

130.    On April 21, 2020, just eight days after she was discharged from The Heights Facility, Ms. Porcaro was pronounced dead. COVID-19 was identified as a cause of death on her Death Certificate.

131.    As evidenced by all of the foregoing, Defendants, and each of them, put residents, staff, vendors, visitors, and their own front-line employees in harm's way by failing to take adequate precautions to protect them from the deadly COVID-19 virus.

**FIRST CAUSE OF ACTION**
**Negligence/Negligence *Per Se***
**All Defendants**

132.    Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein, and further alleges as follows:

133.    Defendants owed a duty to Ms. Porcaro, and the Plaintiff, to provide a safe care facility.

134.    Defendants knew, or should have known, of the danger associated with the COVID-19 virus and should have performed their duties in a manner which adequately protected Ms. Porcaro, and others, from unnecessary exposure and infection.

135.    Defendants negligently and recklessly breached their duties of due care toward Ms. Porcaro by failing to adequately safeguard her from exposure and infection with the COVID-19 virus. Defendants failed to take adequate measures and precautions to prevent injury or illness, failed to develop and implement sufficient infection protocols, and willfully and intentionally disregarded the rights and safety of Ms. Porcaro and countless others.

136.    Defendants violated 42 C.F.R. § 483 in a manner which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

137. Defendants failed to ensure that all alleged violations involving abuse, neglect, exploitation, or mistreatment of residents were reported in a timely manner in violation of 42 C.F.R § 483.12(c)(1) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

138. Defendants failed in that results of all investigations involving abuse, neglect, exploitation, or mistreatment of residents were to be reported to the administrator and/or the designated representative as well as the appropriate officials in violation of 42 C.F.R. § 483.12(c)(4) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

139. Defendants failed to develop and implement a comprehensive person-centered care plan for each resident in violation of 42 C.F.R. § 483.21(b)(1) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

140. Defendants failed to ensure the resident environment remained as free of hazards as possible in violation of 42 C.F.R. § 483.25(d)(1) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

141. Defendants failed to ensure each resident received adequate supervision and assistance in violation 42 C.F.R. § 483.25(d)(2) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

142. Defendants failed to establish an infection prevention and control program that included a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, and others at the facility in accordance with regulations and "following accepted national standards" in violation of 42 C.F.R. § 483.80(a)(1) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

143. Defendants failed to establish an infection prevention and control program that included conforming written standards, policies, and procedures in violation of 42 C.F.R. § 483.80(a)(2) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

144. Defendants failed to establish an infection prevention and control program that included a system for recording incidents identified and the corrective actions taken by the facility in violation of 42 C.F.R. § 483.80(a)(4) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

145. Defendants failed to establish and maintain an infection prevention and control program which was designed to provide a safe, sanitary, and comfortable environment conducive to preventing the development and transmission of communicable diseases and infections including handling, storage, processing, and transporting of linens in a manner so as to prevent the spread of infection in violation of 42 C.F.R. § 483.80(e) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

146. Defendants failed to establish and maintain an infection prevention and control program which was designed to provide a safe, sanitary, and comfortable environment conducive to preventing the development and transmission of communicable diseases and infections including provisions for an annual review and periodic updating of the program in violation of 42 C.F.R. § 483.80(f) which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

147. Defendants violated NAC § 449 in a manner which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

148. Defendants failed to have a governing body legally responsible for carrying out policies regarding the management and operation of the facility in violation of NAC 449.74415 which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

149. Defendants failed to appoint a qualified administrator capable of effectively discharging his/her duties and failed to ensure The Heights Facility was administered in a manner that enabled it to use its resources effectively and efficiently in order to attain and maintain the highest practicable physical, mental and psychosocial well-being of each patient in violation of NAC 449.74417 which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

150. Defendants failed to establish a committee for quality assurance capable of effectively discharging its duties in violation of NAC 449.74419 which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

151. Defendants failed to establish sufficient procedures for emergency or disaster, failed to adopt written procedures to be followed by members of the staff and patients in the case of an emergency or disaster, failed to provide training to employees regarding emergency or disaster procedures upon employment of staff and/or failed to review the procedures with members of the staff, and failed to periodically conduct unannounced drills to practice carrying out the emergency or disaster procedures in violation of NAC 449.74421 which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

152. Defendants failed to maintain a conforming program for the control of infections within the facility in violation of NAC 449.74473 which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

153. Defendants failed to notify a patient, their representative, interested family members, and the patient's physician when significant changes to the medical condition of the patient occur and keeping records of such notifications in violation of NAC 449.74493 which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

154. Defendants violated NAC § 441A in a manner which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

155. Defendants failed to establish an after-hours reporting system for actual or suspected cases of COVID-19 in violation of NAC 441A.225 which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

156. Defendant health care providers failed to report a case or suspected case of an infectious and/or communicable disease, including but not limited to SARS COVID-19, to the health authority with jurisdiction in the manner provided by statute in violation of NAC 441A.230 which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

157. Defendants failed to timely, accurately, and without omission report findings of COVID-19, causative agents of COVID-19, or immune responses to causative agents of COVID-

1   19 in violation of NAC 441A.235 which caused and/or contributed to the death of Ms. Porcaro
2   and the damages alleged herein.

3       158.   Defendant directors or other persons in charge of the medical facility failed to report
4   a case or suspected case of an infectious and/or communicable disease, including but not limited
5   to SARS COVID-19, to the health authority with jurisdiction in the manner provided by statute
6   and to adopt administrative procedures for making such reports in violation of NAC 441A.240
7   which caused and/or contributed to the death of Ms. Porcaro and the damages alleged herein.

8       159.   Defendants failed to timely, accurately, and without omission report actual or
9   suspected cases of COVID-19 to the health authority in violation of NRS 441A.150, NRS
10   441A.190, NAC 441A.230, NAC 441A.240, and NAC 441A.255 which caused and/or contributed
11   to the death of Ms. Porcaro and the damages alleged herein.

12       160.   Defendants violated NRS § 441A in a manner which caused and/or contributed to
13   the death of Ms. Porcaro and the damages alleged herein.

14       161.   Defendants failed to prevent others from exposure to COVID-19 in violation of
15   NRS 441A.180 which caused and/or contributed to the death of Ms. Porcaro and the damages
16   alleged herein.

17       162.   Defendants failed to notify the spouse(s) or legal guardian(s) of individuals isolated
18   or quarantined due to COVID-19 in violation of NRS 441A.520.

19       163.   Defendants had a duty to exercise due care with respect to Ms. Porcaro as defined
20   by the statutes or administrative regulations set forth herein.

21       164.   Ms. Porcaro and Plaintiff were of the class of persons the statutes or regulations set
22   forth herein were designed to protect.

23       165.   Defendants breached their duties by violating the statutes or regulations set forth
24   herein, which constitutes negligence as a matter of law.

25       166.   Plaintiff and Ms. Porcaro were injured, and Ms. Porcaro ultimately died, as a result
26   of the Defendants' breach of their duties by violating the statutes or regulations set forth herein.

27       167.   For the reasons set forth about, it is clear that Defendants were not in substantial
28   compliance with controlling health standards.   Defendants failed to establish policies and

procedures to enforce and implement controlling health standards in a reasonable manner. Ms. Porcaro's injury and death, for the reasons stated above, was not an isolated or unforeseen event.

168.   In the alternative, even if substantial compliance is somehow found, Defendants were grossly negligent for the reasons set forth above and that gross negligence resulted in Ms. Porcaro's injury and ultimate death.

169.   Defendants breached the duty of care they owed to Ms. Porcaro and the Plaintiff, they are also vicariously liable, by virtue of the doctrine of *respondeat superior*, in that the DOE Defendants were acting within the course and scope of their employment when the subject negligence occurred.

170.   Defendants owed a duty of care to Plaintiff and Ms. Porcaro.

171.   Defendants breached the duty of care they owed to Plaintiff and Ms. Porcaro.

172.   Plaintiff and Ms. Porcaro suffered damages as a result of the Defendants' breach of their duties by violating the statutes or regulations set forth herein.

173.   The Defendants' breach of their duty of care owed to Plaintiff and Ms. Porcaro was the legal cause of Plaintiff and Ms. Porcaro's injuries, as well as Ms. Porcaro's wrongful death.

174.   Plaintiff and Ms. Porcaro suffered damages as a result of the Defendants' breach of their duty of care owed to Plaintiff and Ms. Porcaro.

## SECOND CAUSE OF ACTION
### Negligent Hiring, Training, Retention, and/or Supervision
### The Heights of Summerlin, LLC; Summit Care, LLC; Genesis Healthcare, Inc.

175.   Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein, and further alleges as follows:

176.   At all relevant times, Defendant THE HEIGHTS OF SUMMERLIN, LLC was responsible for the hiring, training, supervision, staffing, and retention of the individuals working at The Heights Facility.

177.   THE HEIGHTS OF SUMMERLIN, LLC owed Plaintiff and Ms. Porcaro a duty to ensure that all of its employees, including Defendant DOES, were properly screened, hired, trained, evaluated, and supervised such that it would ensure that its residents were cared for in a proper, safe, prudent, and professional manner.

178. THE HEIGHTS OF SUMMERLIN, LLC breached its duty of care owed to Plaintiff and Ms. Porcaro by failing to ensure that all of its employees, including Defendant DOES, were properly screened, hired, trained, evaluated, and supervised such that it would ensure that its residents were cared for in a proper, safe, prudent, and professional manner.

179. THE HEIGHTS OF SUMMERLIN, LLC owed Plaintiff and Ms. Porcaro a duty to adequately staff The Heights Facility, and/or its affiliated corporate entities named or otherwise identified as ROE CORPORATIONS, with competent staff members in order to provide the necessary care and supervision to residents like Ms. Porcaro.

180. THE HEIGHTS OF SUMMERLIN, LLC breached its duty of care owed to Plaintiff and Ms. Porcaro by failing to adequately staff The Heights Facility, and/or its affiliated corporate entities named or otherwise identified as ROE CORPORATIONS, with competent staff members in order to provide the necessary care an supervision to residents like Ms. Porcaro.

181. At all relevant times, Defendant SUMMIT CARE, LLC was responsible for the hiring, training, supervision, staffing, and retention of the individuals working at The Heights Facility.

182. SUMMIT CARE, LLC owed Plaintiff and Ms. Porcaro a duty to ensure that all of its employees, including Defendant DOES, were properly screened, hired, trained, evaluated, and supervised such that it would ensure that its residents were cared for in a proper, safe, prudent, and professional manner.

183. SUMMIT CARE, LLC breached its duty of care owed to Plaintiff and Ms. Porcaro by failing to ensure that all of its employees, including Defendant DOES, were properly screened, hired, trained, evaluated, and supervised such that it would ensure that its residents were cared for in a proper, safe, prudent, and professional manner.

184. SUMMIT CARE, LLC owed Plaintiff and Ms. Porcaro a duty to adequately staff The Heights Facility, and/or its affiliated corporate entities named or otherwise identified as ROE CORPORATIONS, with competent staff members in order to provide the necessary care an supervision to residents like Ms. Porcaro.

185. SUMMIT CARE, LLC breached its duty of care owed to Plaintiff and Ms. Porcaro by failing to adequately staff The Heights Facility, and/or its affiliated corporate entities named or otherwise identified as ROE CORPORATIONS, with competent staff members in order to provide the necessary care an supervision to residents like Ms. Porcaro.

186. At all relevant times, Defendant GENESIS HEALTHCARE, INC. was responsible for the hiring, training, supervision, staffing, and retention of the individuals working at The Heights Facility.

187. GENESIS HEALTHCARE, INC. owed Plaintiff and Ms. Porcaro a duty to ensure that all of its employees, including Defendant DOES, were properly screened, hired, trained, evaluated, and supervised such that it would ensure that its residents were cared for in a proper, safe, prudent, and professional manner.

188. GENESIS HEALTHCARE, INC. breached its duty of care owed to Plaintiff and Ms. Porcaro by failing to ensure that all of its employees, including Defendant DOES, were properly screened, hired, trained, evaluated, and supervised such that it would ensure that its residents were cared for in a proper, safe, prudent, and professional manner.

189. GENESIS HEALTHCARE, INC. owed Plaintiff and Ms. Porcaro a duty to adequately staff The Heights Facility, and/or its affiliated corporate entities named or otherwise identified as ROE CORPORATIONS, with competent staff members in order to provide the necessary care and supervision to residents like Ms. Porcaro.

190. GENESIS HEALTHCARE, INC. breached its duty of care owed to Plaintiff and Ms. Porcaro by failing to adequately staff The Heights Facility, and/or its affiliated corporate entities named or otherwise identified as ROE CORPORATIONS, with competent staff members in order to provide the necessary care an supervision to residents like Ms. Porcaro.

191. THE HEIGHTS OF SUMMERLIN, LLC; SUMMIT CARE, LLC; and GENESIS HEALTHCARE, INC., as employers, had a duty to protect the Plaintiff and Ms. Porcaro from harm resulting from its employment of the tortfeasor(s).

192.    THE HEIGHTS OF SUMMERLIN, LLC; SUMMIT CARE, LLC; and GENESIS HEALTHCARE, INC., as employers, breached that duty by hiring, retaining, failing to train, supervise, or discipline the tortfeasor(s).

193.    THE HEIGHTS OF SUMMERLIN, LLC; SUMMIT CARE, LLC; and GENESIS HEALTHCARE, INC., breach of their duties as employers was the proximate cause of Plaintiff and Ms. Porcaro's injuries, and Ms. Porcaro's ultimate death.

194.    Plaintiff and Ms. Porcaro suffered damages as a result of the Defendants' breach of their duties as employers.

### THIRD CAUSE OF ACTION
#### Abuse and Neglect of an Older/Vulnerable Person
#### All Defendants

195.    Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein, and further alleges as follows:

196.    At the relevant times, Aletha Porcaro was 82 years old, thereby legally making her an "older person" pursuant to NRS 41.1395(4)(d). Defendants knew, or had reason to know, that Ms. Porcaro was an "older person."

197.    Defendants violated one or more of the laws of the State of Nevada and said violations were the legal cause of Ms. Porcaro's injuries and damages.

198.    Ms. Porcaro suffered a personal injury and, ultimately, died as a result of Defendants' abuse and neglect giving rise to this cause of action for damages for injury or loss suffered by older or vulnerable person from abuse, neglect or exploitation; double damages; attorney's fees and costs in accordance with NRS 41.1395.

199.    Defendants abused Ms. Porcaro by willfully and unjustifiably inflicting pain, injury or mental anguish upon her in violation of NRS 41.1395(4)(a)(1).

200.    Defendants abused Ms. Porcaro by willfully and unjustifiably depriving her of services which are necessary to maintain the physical or mental health of an older person in violation of NRS 41.1395(4)(a)(2).

201.    Defendants assumed legal responsibility or a contractual obligation for caring for Ms. Porcaro, an older person, and/or voluntarily assumed responsibility for Ms. Porcaro's care,

1   and neglected Ms. Porcaro when they failed to provide food, shelter, clothing or services necessary

2   to maintain the physical or mental health of the Ms. Porcaro in violation of NRS 41.1395(4)(c).

3        202.    Defendants acted with recklessness, oppression, fraud and/or malice in causing Ms.

4   Porcaro to suffer a personal injury and, ultimately, causing her death by way of their abuse and

5   neglect giving rise to this cause of action for damages for injury or loss suffered by an older or

6   vulnerable person from abuse, neglect or exploitation; double damages; and recovery of attorney's

7   fees and costs in accordance with NRS 41.1395.

8                       **FOURTH CAUSE OF ACTION**
                            **Breach of Contract**
9                        **The Heights of Summerlin, LLC**

10       203.    Plaintiff repeats and re-alleges the allegations set forth above as though fully set

11   forth herein, and further alleges as follows:

12       204.    Plaintiff, Ms. Porcaro, and THE HEIGHTS OF SUMMERLIN, LLC entered into a

13   written agreement/contract commencing on February 15, 2020 whereby THE HEIGHTS OF

14   SUMMERLIN, LLC agreed to assume responsibility for Ms. Porcaro's care by providing food,

15   shelter, clothing, or services necessary to maintain her physical and mental health while she was

16   in residency at The Heights Facility.

17       205.    THE HEIGHTS OF SUMMERLIN, LLC failed to comply with the

18   agreement/contract by failing to adequately care for Ms. Porcaro and provide the services

19   necessary to maintain her physical and mental health.

20       206.    Ms. Porcaro and the Plaintiff complied with their obligations under the

21   agreement/contract.

22       207.    Ms. Porcaro and the Plaintiff sustained damages as a result of the Breach of

23   Contract.

24                       **FIFTH CAUSE OF ACTION**
                          **Negligent Misrepresentation**
25                       **The Heights of Summerlin, LLC**

26       208.    Plaintiff repeats and re-alleges the allegations set forth above as though fully set

27   forth herein, and further alleges as follows:

28

209. THE HEIGHTS OF SUMMERLIN, LLC, Ms. Porcaro, and Plaintiff were parties to a business transaction concerning Ms. Porcaro's residency and care at The Heights Facility.

210. In the course of its performance of its duties THE HEIGHTS OF SUMMERLIN, LLC provided false information regarding COVID-19 infections and exposure at The Heights Facility.

211. THE HEIGHTS OF SUMMERLIN, LLC provided false information regarding COVID-19 infections and exposure at The Heights Facility for its own pecuniary gain.

212. THE HEIGHTS OF SUMMERLIN, LLC failed to exercise reasonable care or competence in communicating information regarding COVID-19 infections and exposure at The Heights Facility in or around the dates of Ms. Porcaro's residency there.

213. Ms. Porcaro and Plaintiff justifiably relied on the false statements of THE HEIGHTS OF SUMMERLIN, LLC regarding COVID-19 infections and exposure at The Heights Facility in selecting the facility for Ms. Porcaro and remaining at the facility following her initial date of admission.

214. Ms. Porcaro and the Plaintiff sustained damages as a result of THE HEIGHTS OF SUMMERLIN, LLC's Negligent Misrepresentation.

### SIXTH CAUSE OF ACTION
**Fraud/Intentional Misrepresentation**
**The Heights Of Summerlin, LLC**

215. Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein, and further alleges as follows:

216. THE HEIGHTS OF SUMMERLIN, LLC, Ms. Porcaro, and Plaintiff were parties to a business transaction concerning Ms. Porcaro's residency and care at The Heights Facility.

217. In the course of its performance of its duties THE HEIGHTS OF SUMMERLIN, LLC made false representations/misrepresentations to Plaintiff and Ms. Porcaro as to the number of positive and presumed positive cases of COVID-19 at The Heights Facility.

218. At the time THE HEIGHTS OF SUMMERLIN, LLC made the false representations/misrepresentations the defendant knew or believed that the representations were falls or was aware that it lacked a sufficient basis of information to make the representations.

219.   Specifically, THE HEIGHTS OF SUMMERLIN, LLC knew that individuals connected with The Heights Facility (including residents, employees, staff, vendors, etc.) were positive for COVID-19, or presumed positive for COVID-19.

220.   THE HEIGHTS OF SUMMERLIN, LLC lacked sufficient information to make a statement or representation about whether or not individuals connected with The Heights Facility (including residents, employees, staff, vendors, etc.) were positive for COVID-19, or presumed positive for COVID-19.

221.   THE HEIGHTS OF SUMMERLIN, LLC claimed that no residents or staff members were infected with, presumed positive of having, or had died from COVID-19. That was false.

222.   THE HEIGHTS OF SUMMERLIN, LLC knew that individuals connected with The Heights Facility (including residents, employees, staff, vendors, etc.) were positive for COVID-19, or presumed positive for COVID-19.

223.   THE HEIGHTS OF SUMMERLIN, LLC knew that individuals connected with The Heights Facility (including residents, employees, staff, vendors, etc.) were positive for COVID-19, or presumed positive for COVID-19.

224.   THE HEIGHTS OF SUMMERLIN, LLC lacked sufficient information to make a statement or representation about whether or not individuals connected with The Heights Facility (including residents, employees, staff, vendors, etc.) were positive for COVID-19, or presumed positive for COVID-19 prior to Ms. Porcaro's discharge.

225.   THE HEIGHTS OF SUMMERLIN, LLC knew that Ms. Porcaro was experiencing symptoms consistent with COVID-19 on or before the time she was discharged from The Heights Facility.

226.   THE HEIGHTS OF SUMMERLIN, LLC intended to induce Ms. Porcaro, Plaintiff, and other unassuming potential patients/residents to enter The Heights Facility and to prevent them from leaving by making the false statements about COVID-19 infections, presumptive infections, and deaths.

227.   Ms. Porcaro and Plaintiff justifiably relied on the false statements of THE HEIGHTS OF SUMMERLIN, LLC regarding COVID-19 infections and exposure at The Heights Facility in selecting the facility for Ms. Porcaro and remaining at the facility following her initial date of admission.

228.   Ms. Porcaro and the Plaintiff sustained damages as a result of the Fraud/Intentional Misrepresentation.

### SEVENTH CAUSE OF ACTION
#### Wrongful Death
#### All Defendants

229.   Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein, and further alleges as follows:

230.   Ms. Porcaro died on April 21, 2020. COVID-19 was identified as a cause of death on her Death Certificate.

231.   Ms. Porcaro contracted COVID-19 as a resident of The Heights Facility.

232.   Defendants' actions, inactions, negligence, carelessness, recklessness, and other wrongful conduct caused Ms. Porcaro to contract COVID-19, fall ill, and die.

233.   Plaintiff, Rachelle Crupi, is an heir and the personal representative of Ms. Porcaro and the Estate of Aletha Porcaro.

234.   Plaintiff, Rachelle Crupi, suffered damages and injury as a result of the death of Ms. Porcaro.

### IN THE ALTERNATIVE, EIGHTH CAUSE OF ACTION
#### Professional Negligence
#### All Defendants

235.   Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein, and further alleges as follows:

236.   Upon information and belief, this matter is not a case of "Professional Negligence," and thus NRS 41A's requirements do not apply.  Specifically, the damages alleged herein did not result from negligence associated with the medical diagnosis, judgment or treatment of Plaintiff. *Szymborski v. Spring Mt. Treatment Ctr.*, 133 Nev. 638, 641, 403 P.3d 1280, 1284 (2017).   The Nevada Supreme Court has consistently held that "medical facilities have a duty to exercise

1  reasonable care to avoid foreseeable harm when they furnish nonmedical services," and that those

2  injuries do not sound in medical or professional malpractice. *Id, citing DeBoer v, Sr. Bridges of*

3  *Sparks Fam. Hosp.*, 128 Nev. 406, 412, 282 P.3d 730, 732 (2012). Further, the negligence of

4  Defendants did not involve the "exercise of medical judgment." *Szymborski*, 133 Nev. at 642, 403

5  P.3d at 1284, *citing Gold v. Greenwich Hosp. Assn.*, 262 Conn. 248, 811 A.2d 1266, 1270 (Conn.

6  2002). Here, the Defendants failure to implement and/or follow proper safety policies and

7  procedures designed to protect its residents, including Ms. Porcaro, against contagious diseases

8  like COVID-19, does not involve the exercise of medical judgment. The negligence of the

9  Defendants alleged herein does not involve medical services.

10     237.   Furthermore, should this Court disagree with the above and find this case involves

11  the exercise of medical judgment, the actions and/or negligence of the Defendants is such that the

12  "jury is capable of evaluating the reasonableness of the healthcare provider's actions using

13  common knowledge and experience." *Estate of Curtis v. S. Las Vegas Med. Inv'rs, LLC*, 466 P.3d

14  1263, 1267, 136 Nev. Adv. Rep. 39 (2020). The "common knowledge" exception applies "where

15  the carelessness of the Defendant is readily apparent to anyone of average intelligence and ordinary

16  experience" and thus does not require expert testimony." *Id.* In the instant case, the Jury can use

17  their common knowledge and experience to see that the actions of Defendants (or inactions)

18  amounted to negligence. In other words, the jury would not require expert testimony to understand

19  the claim of negligence in this matter.

20     238.   Notwithstanding the above, in an abundance of caution should the Court disagree,

21  Plaintiff pleads, in the alternative, the following professional negligence claim.

22     239.   LATOYA DAVIS, Administrator, owed Ms. Porcaro and Plaintiff a duty of care to

23  comply with the minimum standards of care and practice established in the community for medical

24  care.

25     240.   Tracy L. Rodgers, RN, BSN, WCC, DWC, LNCC, an expert who has practiced in

26  the field, or an area substantially similar to the field with knowledge of the duty of care owed to

27  Ms. Porcaro and Plaintiff by LATOYA DAVIS, examined this case, Ms. Porcaro's injuries and

28  cause of death, and applying the minimum standards of care in this community, prepared an

1  affidavit supporting Plaintiff's allegations which is attached hereto with the expert's curriculum
2  vitae as **Exhibit 1**.

3      241.  ANDREW REESE, Administrator, owed Ms. Porcaro and Plaintiff a duty of care
4  to comply with the minimum standards of care and practice established in the community for
5  medical care.

6      242.  Tracy L. Rodgers, RN, BSN, WCC, DWC, LNCC, an expert who has practiced in
7  the field, or an area substantially similar to the field with knowledge of the duty of care owed to
8  Ms. Porcaro and Plaintiff by ANDREW REESE, examined this case, Ms. Porcaro's injuries and
9  cause of death, and applying the minimum standards of care in this community, prepared an
10  affidavit supporting Plaintiff's allegations which is attached hereto with the expert's curriculum
11  vitae as **Exhibit 1**.

12      243.  Defendants Davis and Reese had a heightened duty to use such skill, prudence, and
13  diligence as other members of their profession commonly possess and exercise.

14      244.  Defendants Davis and Reese breached their duty of care and their breach caused
15  harm to Ms. Porcaro and the Plaintiff.

16      245.  The failure of Defendants Davis and Reese, and each of them, to administer and/or
17  provide care consistent with the minimum standard of care as established in this community in an
18  adequate, reasonable, and professional manner, caused Ms. Porcaro to sustain severe injuries and
19  ultimate death.

20      **DAMAGES ALLEGED**

21      246.  Plaintiff repeats and re-alleges the allegations set forth above as though fully set
22  forth herein, and further alleges as follows:

23      247.  Defendants are jointly and severally liable for damages as a direct and proximate
24  result of their negligent, grossly negligent, willful, and wanton conduct described herein.

25      248.  Defendants' relevant acts and omissions were a legal and proximate cause of the
26  injury to Ms. Porcaro, the Plaintiff, and The Estate of Aletha Porcaro.

27      249.  As a direct and proximate result of the actions, inactions, negligence, carelessness,
28  and recklessness of the Defendants in violating the laws and regulations of the United States and

1  of the State of Nevada, and failing to perform their duties, both express and implied, Aletha
2  Porcaro sustained serious, significant, and deadly injuries, but before dying, endured physical and
3  emotional pain and suffering, experienced a significant deterioration in her enjoyment of life and
4  lifestyle, entitling Plaintiff to statutory damages well in excess of $15,000.

5      250.   As a further direct and proximate result the actions, inactions, negligence,
6  carelessness, and recklessness of the Defendants in violating the laws and regulations of the United
7  States and of the State of Nevada, and failing to perform their duties, both express and implied,
8  Rachelle Crupi sustained serious and significant injuries endured physical and emotional pain and
9  suffering, experienced a significant deterioration in her enjoyment of life and lifestyle, and
10  incurred damages in an amount well in excess of $15,000.

11      251.   As a further direct and proximate result of the actions, inactions, negligence,
12  carelessness, and recklessness of the Defendants in violating the laws and regulations of the United
13  States and of the State of Nevada, and failing to perform their duties, both express and implied,
14  the Estate of Aletha Porcaro incurred damages.

15      252.   The Plaintiff had to retain the services of an attorney to prosecute these actions and
16  is entitled to recover, in the manner described above, reasonable attorney's fees and costs of suit.

17      253.   Plaintiff is entitled to recover punitive damages in addition to compensatory
18  damages for the sake of example and by way of punishing the Defendants pursuant to NRS
19  42.005(1).

20      254.   Defendants acted with recklessness, oppression, fraud and/or malice in causing Ms.
21  Porcaro to suffer a personal injury and, ultimately, causing her death by way of their abuse and
22  neglect giving rise to this cause of action for damages for injury or loss suffered by an older or
23  vulnerable person from abuse, neglect or exploitation; double damages; and recovery of attorney's
24  fees and costs in accordance with NRS 41.1395.

25      255.   Clear and convincing evidence exists to show that the Defendants are guilty of
26  oppression by engaging in despicable conduct that subjects a person to cruel and unjust hardship
27  with the conscious disregard of a person's rights pursuant to NRS 42.001(4). Defendants acted
28  with conscious disregard insofar as they knew of the probable harmful consequences of their

1  wrongful actions and willfully and deliberately failed to act to avoid those consequences pursuant
2  to NRS 42.001(1).

3      256.   Clear and convincing evidence exists to show that the Defendants are guilty of fraud
4  by intentional misrepresentation, deception, or concealment of a material fact known to them with
5  the intent to deprive Plaintiff and Ms. Porcaro of their rights, their property, or to otherwise cause
6  injury to them pursuant to NRS 42.001(2).

7      257.   Clear and convincing evidence exists to show that the Defendants are guilty of
8  malice, express or implied, by engaging in conduct that was intended to injure a person or
9  despicable conduct which is engaged in with a conscious disregard for the rights and safety of Ms.
10 Porcaro, the Plaintiff, and the public pursuant to NRS 42.001(3).

11     258.   As a direct and proximate result of their acts and omissions set forth herein,
12 Defendants are jointly and severally liable for punitive damages.

13 **PRAYER FOR RELIEF**

14     WHEREFORE, Plaintiff, expressly reserving the right to amend the Complaint at the time
15 of trial of the actions herein to include all items of damages not yet ascertained, demands judgment
16 against Defendants, and each of them, as follows:

17     1.  General and specific damages in an amount well in excess of $15,000;
18     2.  Pursuant to the laws of the State of Nevada, NRS 41.1395, double the damages for
19           costs of medical care and treatment and costs incidental thereto, when the same have
20           been ascertained;
21     3.  Punitive damages for the reckless and/or intentional disregard for the safety of Aletha
22           Porcaro in an attempt to protect their business interests;

23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

4.  Reasonable attorneys' fees and costs of suit incurred herein; and

5.  For such other and further relief as the Court may deem just and proper.

Dated this _12th_ day of April, 2021.

HENNESS & HAIGHT

MICHAEL D. HAIGHT, ESQ.
Nevada Bar No. 5654
GENEVIEVE ROMAND, ESQ.
Nevada Bar No. 13235
8972 Spanish Ridge Avenue
Las Vegas, Nevada 89148
*Attorneys for Plaintiff*

# EXHIBIT 1

## DECLARATION OF ALETHA PORCARO BY
## TRACY L. RODGERS RN, BSN, RN-CLTC, WCC, DWC, LNCC

I, Tracy L. Rodgers, RN, BSN, WCC, DWC, and LNCC hereby declare and state as follows:

1. I am a resident of Washington County, Utah. If called as a witness, I could competently testify to the following from my own personal knowledge. I base this personal knowledge upon my education, training, and experience, as well as my review of the records from Heights of Summerlin, and the Division of Public and Behavior Health from the State of Nevada, notes from Ms. Porcaro's family.

2. I am a Registered Nurse licensed to practice in Arizona, Illinois, Nevada, and Utah. I graduated Sigma Theta Tau and Golden Key National Honor Society in 1994 with my BSN. I have been working since 1990 as a Registered Nurse in numerous areas within the nursing profession including but not limited to: medical and surgical units, Long Term Care Nursing, Home Health, Swing Bed Unit, and a wound center. I have extensive knowledge and training in infection control practices, reporting, and education regarding the COVID-19 virus. I am an Instructor for Relias, teaching various wound related programs. I am also a Continuing Education Provider issued by the Nevada State Board of Nursing, and currently teach a Wound Care/Staging Course, Nursing Documentation Course, and Fall Prevention in the Elderly Course. I am well versed in all aspects of patient safety, infection control, COVID related infection control practices, and caring for the geriatric clientele in Long-term care, Assisted Living, Home Health, and Hospital related centers. I have had extensive training for residents/patients who have dementia and/or Alzheimer's Disease. I am also the Past-Chair for the American Association of Legal Nurse Consultants Certification Board, and sit as a subject matter expert, in regards to wound care, diabetic care, personal injury cases, medical malpractice cases, rehabilitation, and long-term care cases.

3. I was retained by the Office of Henness and Haight for the purpose of rendering my opinion as to whether or not the care and treatment rendered by Heights of Summerlin (to ALETHA J. PORCARO), deceased, met the nursing standards of care, and/or infection control related standards of practice.

4.     Ms. Porcaro had fallen on or around February 1, 2020, and sustained a fractured femur.  She was admitted to Summerlin Hospital on or around February 2, 2020.  She had a surgical repair of that fracture and was transferred to the Heights of Summerlin, on or around February 15, 2020.  She was admitted for rehabilitation at the Heights of Summerlin and the plan was to transfer her to a new senior adult complex once her rehabilitation for her surgical repair was finished.

On or around March 12, 2020, the family of Ms. Porcaro was told that they could not visit her at the facility due to COVID-19 and restrictions, to keep residents safe at the facility.  The family was also told, on or around March 19, 2020, that there were no sick employees or residents at the Heights of Summerlin, related to COVID infections.

Ms. Porcaro received rehabilitation services at the Heights of Summerlin until, on or around, April 13, 2020.  She was discharged to her new senior apartment at The Wentworth.  At her time of discharge, neither her, nor her family, or The Wentworth facility, indicated that they were aware that there were COVID-19 infections, with resultant deaths, from the Heights of Summerlin facility.

On or around the morning of April 14, 2020, less than 24 hours after Ms. Porcaro's admission to The Wentworth, Ms. Porcaro started to run a fever, and was symptomatic for COVID.  She was transported to the Summerlin Hospital that evening where a COVID-19 test was run.  It showed positive on or around April 16, 2020.

Ms. Porcaro continued to deteriorate rapidly from the COVID-19 virus.  She died at Summerlin Hospital on or around April 21, 2020, with COVID being one of her diagnosis on her Certificate of Death.

5. A review of the Division of Public and Behavioral Health report/complaint dated May 8, 2020 was done. This inspection was started on April 14, 2020.  Inspectors noted extensive violations of infection control practices throughout the facility.  A very detailed report was filed and the following deficiencies were noted:

- Staff assigned to the quarantine areas used N95 masks which were not fit tested or medically cleared for use of the N95 mask.
- Residents received physical therapy in a gym without the use of a face mask.
- Residents were outside of their rooms without masks; including one resident in a quarantine area who had symptoms.

- A laboratory vendor visited several areas of the facility, including the quarantine area, without disinfecting the cart.
- Staff were not clear about the personal protective equipment (PPE) that had to be used in designated areas.
- Staff used on-impervious gowns in the quarantine area.
- A physician was observed in the quarantine area without proper PPE.
- Environmental staff cleaned the floor with an ammonia disinfectant and used a blower to dry the floor.
- No biohazard trash receptacles were at the exit of the quarantine areas for the disposal of used PPE equipment.
- The facility did not have a policy in place for social distancing for the use of elevators.
- The state survey team was not screened at the reception area and were escorted to a conference room without being properly screened.
- The staff were observed to not be social distancing in common areas of the facility.
- The staff wore PPE, isolation jumpsuits and gowns improperly, and used/contaminated jumpsuits and shoe covers were found in the clean doffing room.  Staff did not follow the procedure for disinfecting the jumpsuits prior to leaving the quarantine areas.
- Vendors were not screened at the service door prior to entering the facility.
- Staff with underlying conditions did not have medical clearance and documentation related to fit test for the use of respirators and N95 masks and health questionnaires were incomplete.
- The facility failed to ensure the Infection Preventionist or designee reported data related to positive COVID-19 cases for both residents and staff, and COVID related deaths to the Office of Public Heath Informatics and Epidemiology (OPHIE). This failure caused inaccurate, and inconsistent reporting; a complete failure to report infections of residents and staff in a timely manner, as well as COVID related deaths.

- According to the OPHIE, it was discovered that the facility failed to report back in a timely manner. They failed to report correct names on cases, failed to have all data entries complete regarding reporting, failed to put correct information in the system (often with misinformation), entered duplicates, and failed to make corrections to these errors in a timely manner, as requested by the state entities. Deaths related to COVID were not reported on the appropriate forms.
- The facility failed to ensure proper infection control practices during the response to the COVID-19 outbreak.
- Failed to identify isolation rooms, and failed to ensure guidelines for cleaning and storage of PPE were followed.
- The last N95 screening was on October 12, 2018, and screening and questionnaire forms related to N95 masks were incomplete and failed to show a pass/fail.
- New employees were not fit tested, or taught how to don/doff PPE.
- By May 8, 2020, the Nurse Educator identified only herself as the only employee who was able to perform the N95 mask fit testing; she was not able to answer questions regarding the fit testing procedure, medical clearance procedures or disqualifying conditions.
- All individual medical screening done by the facility's Medical Director were missing information and had errors. Most of the medical screening forms by the staff were incomplete or not followed upon if there were cardiopulmonary issues noted.
- A Unit Clerk was observed working without PPE equipment, in an area designated by the facility as a quarantine area.
- Residents were in the dining area and hallway, without surgical masks.
- Housekeepers were cleaning the isolation area without being fitted for N95 masks, had not been medically screened or fit tested, or received appropriate education related to PPE. Housekeeping was also not aware of isolation rooms and failed to don/doff appropriate PPE when entering or leaving rooms.
- Physicians and nursing staff were observed not wearing full PPE and not donning and doffing PPE appropriately going into and out of the isolation areas.

- There was improper education to housekeeping staff regarding the change of infection control/PPE equipment.
- There was a lack of placing dirty, and cleaned PPE equipment in the appropriate storage room, container, or disposable bins.
- Clean linen was left on the floor.
- Contaminated jumpsuits were donned and doffed without regard to appropriate infection control practice.

6.   Ms. Porcaro was a resident during the time when it was noted that the Heights of Summerlin failed to ensure an infection control program was in place which would protect the staff and the residents.   Moreover, there was a frank disregard for reporting to state and federal agencies about the severity of the COVID-19 infections, and deaths, at the Heights of Summerlin.   By May 20, 2020, it was noted that the Nevada deaths related to COVID-19, that 26% of the entire death population were coming from the Heights of Summerlin.

Basic safety and infection control practices were completely disregarded by the Heights of Summerlin.   There was a lack of timely and accurate reporting to staff, residents, resident families, and local, state, and federal agencies.   There was an overall lack of accountability by the Heights of Summerlin as it related to providing a safe environment during this pandemic.   As such, Ms. Porcaro, contracted the COVID-19 virus on or around April 12, 2020, while a resident at the Heights of Summerlin.   She was one of hundreds of residents who died while under the care and treatment of Heights of Summerlin, related to the lack of an infection control plan and appropriate infection control measures.

8.   It is my professional opinion that the care and treatment of ALETHA J. PORCARO, deceased, while she was a resident at the Heights of Summerlin, did not meet applicable standards of infection control practice.    There were numerous deficiencies which led to the widespread outbreak and infections within the Heights of Summerlin facility which could have been prevented if appropriate care and treatment, education, fit testing, better administrative oversight, more thorough teaching and education, and appropriate reporting were implemented and consistently followed.

9.   As a result of the failure to observe infection control practices, the Heights of Summerlin ensured that numerous employees and residents would come in contact with the COVID-19 virus, resulting in Ms. Porcaro's death.

10. In the event that additional evidence or records become available to me, I would reserve the opportunity to formulate and propound supplementary opinions in this matter as well as modify the opinions expressed herein.

11. All of the above opinions are stated to a reasonable degree of nursing probability and I declare the same to be true and correct to the best of my knowledge under penalty of perjury.

///

///

TRACY L. RODGERS, RN, BSN, WCC, DWC, LNCC

# Tracy Lynn Rodgers RN, BSN, LNCC, RN-CLTC, WCC, DWC
1701 East 5250 North Cedar City, Utah 84721
Cell: (702) 219-9752
E-mail: tracy.erei@gmail.com

## *Education:*
Kaplan College of Professional Studies Legal Nurse Consultant- Jan. 2004.
Weber State University Bachelor of Science in Nursing- June 1994.
Weber State University Associate RN- June 1990.

## *Professional Affiliations:*
Dixie Technical College: Licensed Practical Nursing Program Standards Writer—2018
American Legal Nurse Consulting Certification Board—Board Member Jan. 2013- Dec. 2018;
Board President 2014-2016.
American Association for Long Term Care Nursing 2009
National Alliance of Wound Care (NAWC) 2009
American Association of Legal Nurse Consultants 2004
Delta Epsilon Tau 2004
Sigma Theta Tau 1994
Golden Key National Honor Society 1994

## *Professional Certifications:*
Healthcare Food Handler's Permit:  January 2019
Diabetic Wound Certified:  September 2015 (renewing)
Wound Debridement Certification with Surgeon Preceptorship: 2010
Wound Care Certified:  July 26, 2009 (Recertified 2014, and 2019)
RN in Long Term Care Certificate Program: RN-CLTC: July 11, 2008
Board Certified in Legal Nurse Consulting:  June 2006 (Recertified 2011, and 2016)
Registered Nurse in Arizona (1991), Illinois (2009), Nevada (1991), Utah (1990):  current
Basic Life Support:  current

## *Privileges and Appointments:*
Nevada CE Provider for Wound Management with Appropriate Dressing Selection---August
2017
Nevada CE Provider for Pain Assessments Done Right—August 2017
Nevada CE Provider for Nursing Documentation Course:  A Reflection of You…Nursing
Documentation at Its Best and Worst—March 20, 2017
Nevada CE Provider for Fall Prevention in The Elderly—March 20, 2017
Nevada CE Provider for Wading Through Wound Care Course—March 20, 2017
Mesa View Regional Hospital:  Allied Health Staff Provider/Department of Surgery/Wound
Consultant:  June 15, 2010, through March 2014.

## *Work History:*
02/20-Present:  Relias-Wound Care Education Institute Instructor-Wound Care Instructor Diabetic Wound Instructor, Ostomy Management Specialist Instructor.
08/17 – Present:  Free Doctor's Clinic— Wound and Diabetic Specialist.
7/14 - Present: Mesa View Home Care:  Wound Care Consultant, Quality Assurance/Marketing
11/18 – 12/20: Avalon Southern Utah Veteran's Healthcare—Wound Care Specialist, Fall Prevention and Management Team, Quality Assessment and Process Improvement Team, Educational Instructor.
01/05 - 2020:  First Choice Legal Nurse Consulting, LLC, --Legal Nurse Consultant Certified.
6/10 - 12/11:  Virgin Valley Home Care: Wound Care and Home Care Nurse
2/10 - 3/14:  Advanced Wound Care Consultants, LLC, consultant on wound care for out-patient services/homecare/physicians, etc.
2/07 – 3/14:  Mesa View Regional Hospital—Medical/Surgical, Swing Bed Unit, Labor and Delivery, Nursery.
4/04 – 12/04: Harris Injury Lawyers–Inhouse Legal Nurse Consultant.
3/00 – 12/03: Option Care Infusion Services.
01/93 – 06/94: Instructor for LPN school of nursing–Mojave School of Nursing–focusing on Labor and Delivery and Medical Surgical teaching.
01/91 – 04/04: Gentiva Health Services Home Care.
03/90 – 12/95: Dixie Regional Medical Center–worked Labor and Delivery/Nursery OB/GYN, Medical/Surgical floors, Same Day Surgery Admitting, Emergency Room and Intensive Care, Charge Nurse for Surgical floor.
06/89 – 06/91: St. George Care Center and Porter's Nursing Home for care of geriatric patients.

## *Honors:*
Individual Gold Volunteer Service Award 2018 signed by President Donald Trump.
Ms. America Gold Volunteer Service Award 2017 signed by President Barack Obama.
Letter of Commendation from Mayor Andy Hafen.
International Nurses Association:  Top Nurses 2017.
Cambridge Who's Who Registry of Executives and Professionals 2007.
Who's Who In American Nursing 1996.

## *Publications:*
How to Know if Your Loved One is Right for Home Health: View On Magazine—March 2020
Legal Nurse Consulting Principles and Practices:  Contributor, Chapter 1: History, Entry into Practice, and Certification. —November 2019
Home Care and Hospice in 2019: View On Magazine—May 2019

## *Speaking Engagements:*
March 8-11, 2021:  Wound Care Course WCEI: Live online
February 23-March 4, 2021: 6 day Wound Care Course WCEI: Live online
February 18, 2021: Palliative Care and Wounds: Relias
February 8-11, 2021: Wound Care Course WCEI: Lake Geneva, WI

January 26-February 4, 2021: Wound Care Course WCEI: Live online
January 7, 2021:  Skin of Color and Wound Care Webinar:  Relias
November 9-12, 2020: Wound Care Course WCEI: Live online
October 26-29, 2020: Wound Care Course WCEI: Live online
September 29-October 1, 2020: Wound Care Course WCEI:
September 24-27, 2020: Wild On Wounds Emcee: Relias/WCEI
September 8-10, 2020: Wound Care Course WCEI: Live online
August 8-11, 2020: Wound Care Course WCEI:  North Bend, OR
July 27-30, 2020:  Wound Care Course WCEI: Live online
July 17, 2020: How To Find The Best Nursing Home Webinar
June 24, 2020: Legal Implications in Wound Care/Wound Care Gurus
June 8-17, 2020: Wound Care Course WCEI: Live online
May 1, 2020:  Nursing Communication: How To Huddle: Southern Utah Veteran's Home
April 27-30, 2020:  Ostomy Management Course WCEI; Live online
March 15-19, 2020:  Wound Care Course WCEI: Live online
December 3, 2019: Time Management and Increasing Productivity—Southern Utah Public
Health Department Winter Conference Keynote Speaker—St. George, UT
September 26, 2019:  Women Mean Business:  Mesquite Chamber of Conference Women's
Conference—Mesquite, NV.
September 11, 2019: Debridement Instructor at the Wild on Wounds Conference—Las Vegas,
NV.
August 27, 2019:  Wound Care Identification and Management; Dressing Selection—Rocky
Vista University Medical School—Ivins, UT
June 11, 2019: Skin Care in the Long-term/Skilled Nursing Facility; Prevention is Key—
Southern Utah Veteran's Home—Ivins, UT
June 7, 2019: Wound Care Identification and Management—Free Doctor's Clinic Medical
Providers—St. George, UT
May 8, 2019: The Role Of Hospice in the Community for the Mesquite Chamber of
Commerce—Mesquite, NV
February 27, 2019: CNA Team Leaders Role in Preventing Skin Breakdown in the Skilled and
Long-term Care setting—Southern Utah Veteran's Home—Ivins, UT
February 6, 2019:  Wading Through Wound Care—Southern Utah Veteran's Home—Ivins, UT
April 21, 2018:  Keynote Speaker at District 5420 Rotary International Conference:  Surviving
Mile Marker 97—Springdale, UT.
April 11, 2018:  Keynote Speaker for RRCI Empower People with Special Needs Conference:
Surviving Mile Marker 97—St. George, UT.
April 9, 2018:  Fall Prevention in the Elderly, and A Reflection of You… Nursing
Documentation at Its Best and Worst— Seasons Health and Rehabilitation; St. George, UT.
October 4, 2017:  Debridement Instructor at the Wild on Wounds Conference--Las, Vegas, NV.
August 29, 2017:  Fall Prevention in The Elderly—Mesquite, NV
August 29, 2017:  Wound Management with Appropriate Dressing Selection—Mesquite, NV.
June 14, 2017:  Keynote Speaker at the Oregon Risk Insurance Management Society Conference
Surviving Mile Marker 97—Portland, OR.
April 8, 2017:  Keynote Speaker at the American Association of Legal Nurse Consultants
Forum:  Surviving Mile Marker 97—Portland, OR.
March 30, 2017:  Wading Through Wound Care – Encompass Home Care and Hospice

3

March 29, 2017:  Fall Prevention in The Elderly--Private Class
March 29, 2017:  A Reflection of You… Nursing Documentation at Its Best and Worst – Private class.
March 29, 2017:  Wading Through Wound Care.  – Private class.
March 2016:  Pressure Ulcer Care and Treatment/Staging with new updates – Mesa View Home Care.
January 5, 2015:  Pressure Ulcer Care and Treatment and Staging—Horizon Hospice.
August 27, 2104:  Pressure Ulcer Care and Treatment and Staging-- Mesa View Home Care.
August 5, 2014:  A Reflection of You…Nursing Documentation at Its Best and Worst—Mesa View Home Care.
May 15, 2013:  Pressure Ulcer Staging and Early Identification of Wounds – Mesa View Medical Group.
May 8, 2013:  A Reflection of You…Nursing Documentation at Its Best and Worst.—Mesa View Home Care.
October 18, 2012: Wound and Nursing Documentation Seminar—Advanced Wound Care Consultants.
September 5, 2012:  Wound Inservice, Pressure Ulcer Identification, Specialty Wound Products—Serenity Hospice.
December 15, 2011:  Wound and Pressure Ulcer Inservice—Mesa View Regional Hospital.
December 14, 2011:  Wound and Pressure Ulcer Inservice—Mesa View Regional Hospital.
March 8, 2011:  Wound and Pressure Ulcer Inservice—Zion's Way Home Health and Hospice.
March 3, 2011:  The Importance of Wound Care—Senior Circle at MVRH.
December 14, 2010:  Pain and Fall Assessment, Wound Documentation, Nursing Documentation Seminar—Mesa View Regional Hospital.
November 10, 2010:  Wound Care Identification and Pressure Ulcer Inservice—Virgin Valley Home Care.
May 12, 2010:  Pain and Fall Assessment, Wound Documentation, Nursing Documentation Seminar—Mesa View Regional Hospital.
May 14, 2008:  Nursing Documentation Seminar-Beaver Hospital.
January 31, 2008:  Career Day Guest Speaker—Grant Bowler Elementary.
September 2006:  Nursing Documentation Seminar—Dixie Regional Medical Center/wound and IV clinic.
May 2006:  Mock Trial for Nevada Paralegal Association—medical information.
January 2006: Video for mediation presenting medical information and prognosis.
October 2005: Presentation of defense and plaintiff medical records for Mock Trial—Las Vegas, NV.
May 2005:  Nursing Documentation and Legalities—Virgin Valley Home Care.
March 2005: Women's Conference on Women's Health Issues.
March 2004: Nursing Documentation and Legalities—Gentiva Health Services.
September 2004: Health Fair/Women's Health Issues.
1995: National Conference of Business and Professional Women: Women's Health Issues.
1993: Hospice Seminar:  Stress and Pain Management.

### ***Continuing Education:***
Available upon request